UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| TITO BARRON-AGUILAR, | Case No. 3:17-cv-00548-MMD-CLB |
|---|---|
| Petitioner, | ORDER |
| v. | |
| GABRIELA NAJERA, *et al.*, | |
| Respondents. | |

**I.    SUMMARY**

This habeas matter is before the Court on Petitioner Tito Barron-Aguilar's motion for reconsideration (ECF No. 91) of the Court's order denying his second amended petition for writ of *habeas corpus* under 28 U.S.C. § 2254, a certificate of appealability, and his motion for discovery and an evidentiary hearing (ECF No. 88). Also before the Court is Petitioner's motion to extend. (ECF No. 101.) For the reasons discussed below, the Court denies Petitioner's motion for reconsideration and grants his motion to extend *nunc pro tunc*.

**II.    BACKGROUND**

In his second amended petition, Petitioner challenges a 2014 state court judgment of conviction for four counts of unlawful sale of controlled substance, three counts of trafficking in a controlled substance, and one count of conspiracy to violate the Uniform Controlled Substances Act. In Ground C of his second amended petition, Petitioner alleged that his right to a fair trial and due process rights were violated because the State failed to correct or disclose the benefit an individual who worked as an informant, Charles Kurash, received as a result of his cooperation with the State. (ECF No. 38 at 20-23.) Kurash testified at trial that he used methamphetamine, purchased drugs from Petitioner,

1   and worked with Detective Rasmussen to perform controlled buys. (ECF No. 24-1 at 131-
2   32.)

3         Kurash testified that he did not expect or receive any benefit for his cooperation,
4   but that he was working as a confidential informant on behalf of his wife. (ECF No. 38 at
5   20-23.) Petitioner alleges that Kurash was arrested on November 17, 2013, for robbery,
6   was released, and another robbery took place on December 5, 2013. (*Id*.) Kurash
7   confessed to the robberies in May 2014. (*Id*. at 21.) Kurash pled guilty to both robbery
8   charges and was sentenced to 26-120 months and a concurrent term of 16-72 months.
9   (*Id*.) Petitioner alleges that the state court suspended Kurash's sentence because of the
10  "good work" Kurash did as an informant. (*Id*.)

11        Petitioner alleges that the State failed to disclose Kurash's criminal history and that
12  his trial counsel "was not aware that Kurash had open robbery cases at the time of
13  [Petitioner]'s trial." (*Id*.) He asserts that the State failed to disclose impeachment evidence
14  in the form of Kurash's criminal history in violation of *Brady*. (*Id*. at 23.)

15        The Court entered a final order denying Petitioner's second amended petition and
16  judgment was entered. (ECF Nos. 88, 89.) Petitioner now moves the Court to reconsider
17  its order denying relief under Federal Rule of Civil Procedure 59(e), arguing that the Court
18  misconstrued or overlooked key facts. (ECF No. 91 at 4.) He argues that the Court failed
19  to address the benefit that Kurash received when he was allowed to remain free and
20  working for the police as an informant, despite being arrested twice for robbery, that the
21  Court erred as a matter of law because the overlooked evidence was material, and that
22  the Court erred as a matter of law because Kurash was not impeached with equivalent
23  evidence. (*Id*. at 4-12.) Petitioner further argues that the Court overlooked the importance
24  of Kurash's testimony. (*Id*. at 11-12.)

25  **III.   DISCUSSION**

26        Rule 59(e) of the Federal Rules of Civil Procedure states that a "motion to alter or
27  amend a judgment must be filed no later than 28 days after the entry of the judgment."
28  Fed. R. Civ. P. 59(e). A post-judgment motion for reconsideration in a habeas proceeding,

2

filed within 28 days of entry of the judgment, is properly construed as a motion to alter or amend the judgment under Rule 59(e). *See Rishor v. Ferguson*, 822 F.3d 482, 489-90 (9th Cir. 2016) (citing *Am. Ironworks & Erectors*, *Inc. v. N. Am. Const. Corp.*, 248 F.3d 892, 898-99 (9th Cir. 2001); 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (2012) ("Rule 59(e) does, however, include motions for reconsideration.").

As the Ninth Circuit has recognized, "a Rule 59(e) motion is an 'extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources'." *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (citing *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)). Absent highly unusual circumstances, reconsideration under Rule 59(e) is "available only when (1) the court committed manifest errors of law or fact, (2) the court is presented with newly discovered or previously unavailable evidence, (3) the decision was manifestly unjust, or (4) there is an intervening change in the controlling law." *Rishor*, 822 F.3d at 491-92 (citing *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011)); *see also Wood*, 759 F.3d at 1121 (citing *McDowell v. Calderon,* 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc)). Rule 59(e) motions "may not be used to 'raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation'." *Rishor*, 822 F.3d at 492 (citing *Herron*, 634 F.3d at 1111).

The Ninth Circuit has set forth criteria specific to evaluating a Rule 59(e) motion for reconsideration in a habeas case. The Court must as an initial matter "determine whether the motion should be construed as a second or successive habeas petition: that is whether it seeks to raise an argument or ground for relief that was not raised in the initial habeas petition." *Id.* (quoting *Herron*, 634 F.3d at 1111). If the Court determines that the motion should be treated as successive, the Court should deny the motion and allow the applicant to seek leave from the Court of Appeals to file a successive petition.. *Id.* But the Court may proceed to consider the merits of a Rule 59(e) motion that is filed within twenty-eight days of judgment and asks the court to correct errors of fact or law.

3

As always, the district court will "enjoy [ ] considerable discretion in granting or denying the motion." *Id.*

Here, the Court considers the merits of the Rule 59(e) motion. Petitioner argues that reconsideration is warranted to correct manifest errors of law and fact on which the judgment is based. In particular, Petitioner argues that the Court overlooked the implicit agreement that Kurash had with the State concerning his robbery arrests. (ECF No. 91 at 5.) He asserts that this overlooked fact was material and the Court erred as a matter of law when rejecting materiality as speculative. (*Id.* at 7.) He further asserts that the Court erred because impeachment evidence should not be treated equally. (*Id.* at 9.) Petitioner argues that the Court overlooked the importance of Kurash's testimony. (*Id.* at 11.) The Court will address each argument in turn.

### A. Factual Issue that Kurash was Released

Petitioner contends that the Court overlooked the fact that Kurash was released on two separate robbery cases based on an "implicit agreement" because Kurash was working with the State as an informant. (ECF No. 91 at 5-7.) Despite Petitioner's contention that the Court overlooked factual issues, the Court considered Kurash's release as part of the asserted withheld evidence when it denied Ground C. In its review of the background information, the Court noted that Petitioner alleges that Kurash was arrested in November 2013 for robbery, was released, and another robbery took place in December 2013. (ECF No. 88 at 16.) The Court further noted that Petitioner alleges that the State failed to disclose Kurash's criminal history, and that his trial counsel "was not aware that Kurash had open robbery cases at the time of Petitioner's trial." (*Id.*) The Court quoted the Nevada Supreme Court's decision affirming the denial of Petitioner's state habeas petition, including a footnote that discusses Kurash's "release (or lack of confinement after arrest)" that "was due to some agreement with the State." (*Id.* at 17.)

In its conclusion, the Court held that the Nevada Supreme Court's decision is not contrary to, nor an unreasonable application of federal law as determined by the United States Supreme Court and is not based on unreasonable determinations of fact in the

1 state court record. (*Id.*) In addition, the Court concluded that Petitioner failed to demonstrate materiality and discussed the corroboration of Kurash's testimony by detectives, Petitioner's admissions at trial, and impeachment evidence. (*Id*. at 18-19.) The Court considered the Nevada Supreme Court's decision and the Court's conclusions regarding materiality encompasses all asserted withheld evidence, including Kurash's release. Accordingly, Petitioner has not demonstrated that the Court overlooked an implicit agreement related to Kurash's release in its decision denying Petitioner's habeas petition.

### B.  Manifest Errors of Law or Fact as to Materiality

Petitioner argues that the Court committed a manifest error of law in citing *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam), and *Barker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005), in support of the finding that "Petitioner can only speculate that disclosure of the alleged withheld evidence would have made a different result reasonably probable, and Petitioner fails to establish materiality based on such speculation." (ECF No. 88 at 18.) Although Petitioner distinguishes his claim from the facts of *Woods* and *Barker*, the Court's application of the holdings in those cases does not establish a manifest error of law by the Court.

In *Wood*, the Supreme Court held that it was not reasonably likely that disclosure of polygraph results, which were inadmissible under state law, would have resulted in a different outcome at trial. *See* 516 U.S. at 9. The Supreme Court reversed the Ninth Circuit's decision that the inadmissible evidence was material and characterized the lower court's judgment as "based on mere speculation, in violation of the standards we have established" in *Brady* and its progeny. *Id.* at 6. Although the withheld evidence here was admissible unlike the withheld evidence in *Wood*, the Court found that Petitioner failed to establish materiality because he could only speculate that the alleged withheld evidence would have made a different result at trial reasonably probable. (ECF No. 88 at 18.)

In *Barker*, the petitioner argued that withheld evidence would have shown that the state agreed to drop a residential burglary charge against the witness in exchange for

5

favorable testimony. 423 F.3d at 1098. As cited in the Court's order, the Ninth Circuit found that the petitioner's argument was based on speculation and that the withheld evidence was not material as "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id*. at 1099. Similarly, here, the Court found that Petitioner failed to establish materiality based on speculation that disclosure of the withheld evidence would have made a different result reasonably probable. (ECF No. 88 at 18.)

The factual distinctions between the cases as noted by Petitioner does not establish that the Court committed a manifest error of law in finding that Petitioner failed to establish materiality and denying Ground C. The record supports the findings that led to the Court's ruling that there is no reasonable probability that the trial outcome would have been different had the evidence been disclosed. Even without citing *Wood* and *Barker* as support, the Court would have nonetheless denied relief because Petitioner's claim did not undermine confidence in the outcome at trial. The Court considered the detectives' corroborating testimony, Petitioner's admissions at trial, and other impeachment evidence in its materiality determination.

Petitioner also argues that the Court should find that the withheld evidence was material under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), which has a considerably less demanding standard than the *Brady* material standard. (ECF No. 102 at 4-6.) A claim under *Napue* will succeed when the claimant carries the burden of showing (1) testimony (or evidence) was actually false, (2) prosecution knew or should have known that the testimony was actually false, and (3) … the false testimony was material." *Dickey*, 69 F.4th at 636. In contrast to the *Brady* material standard, under *Napue*, a conviction is "set aside whenever there is *'any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Jackson v. Brown*, 513 F.3d 1057, 1067 (9th Cir. 2008).

It is unclear whether Petitioner alleged a *Napue* claim in his state postconviction proceedings or before the state appellate court. To the extent that the Nevada Supreme

6

Court never reached adjudication of the materiality prong of the *Napue* claim, the Court nevertheless concludes, even on *de novo* review, that there is no reasonable likelihood that the withheld evidence could have affected the judgment of the jury. *See Jackson*, 513 at 1067.

In his testimony to the jury, Petitioner admitted that he obtained methamphetamine for Kurash, received money, and arranged drug deals for Kurash. Petitioner's theory of the case was that he was merely a procuring agent acting as a middleman between the buyers and the seller. (ECF No. 102 at 5.) At trial, he contended that he did not sell drugs or make money from the transactions. (*Id*.)

Ample evidence, however, rebutted the contention that Petitioner was only a procuring agent. The State presented audio recordings of the controlled buys. On one recording during a controlled buy on December 4, Petitioner discusses a deal with Kurash where if Kurash finds more clients for Petitioner, Kurash will receive a commission. (ECF No. 26-1 at 175.) Detective Rasmussen testified that he determined that the narcotics came from a trailer that was associated with Petitioner because Petitioner was paying the power bill. (ECF No. 24-1 at 233.) Detective Rasmussen testified that runners were observed going to and from that trailer between deals. (*Id*. at 234.) Detective Rasmussen testified that during the investigation he determined that Petitioner moved to a new residence because vehicles Petitioner used were located there. (*Id*. at 239.) He further testified that during the December 4th controlled buy, he listened to Kurash's phone call to Petitioner, and Petitioner instructed Kurash to come to his new residence. (*Id*. at 237-38.) During the December 4th controlled buy, Petitioner drove from his residence to the trailer to obtain the drugs after Kurash met and paid Petitioner. (*Id*. at 242.)

Detective Marconato's and Detective Chalmer's testimony also rebut Petitioner's procuring agent theory of defense. Detective Marconato testified that officers collected 23.9 grams of narcotics from the address that detectives determined was Petitioner's residence.[1] (ECF No. 25-1 at 72-73.) He further testified that officers collected 294.4

---

[1] Detectives Smith and Leyva, however, testified that they searched Petitioner's

7

grams of "methamphetamine packaged in 432 small plastic baggies," as well as 461.2 grams of methamphetamine in various plastic bags from the trailer associated with Petitioner. (*Id*. at 76-79.) Detective Chalmers testified that he followed Petitioner who moved between his residence and the trailer. (*Id*. at 239.) Detective Chalmers executed the search warrant at the trailer, and within a tall stereo speaker, officers located a plastic container with approximately one pound of methamphetamine and a digital scale. (*Id*. at 245-47.) He testified that the amount retrieved from the search warrant "far exceed[ed]" the amount expected for personal use. (*Id*. at 249-50.) Officers also located documents containing ledgers and notations relating to drug transactions, as well as three flip phones and an iPhone. (*Id*. at 58, 83.)

Detective Leyva testified that he assumed the role of an undercover officer to purchase narcotics from Petitioner. (ECF No. 25-1 at 102.) Detective Leyva contacted Petitioner over the telephone, informed him he was looking to purchase, and they arranged to meet the following day. (*Id*. at 112.) He further testified that he informed Petitioner that he wanted to meet to discuss additional purchases, quantities, and prices and that Petitioner seemed very willing to discuss those topics. (*Id*. at 114-15.) Detective Leyva texted the same phone number that he used to call Petitioner confirming that they would meet, and Detective Leyva met with an individual who gave him narcotics in exchange for $200. (*Id*. at 127-29.)

In light of the strong evidence presented by the State, the *Napue* violation could not have affected the judgment of the jury. The jury heard and rejected Petitioner's contention that he never sold methamphetamine and was merely a middleman supplying narcotics as a favor. Petitioner "testified in his own defense . . . but the jury disbelieved him," and "the physical evidence" and various other pieces of evidence "pointed to his guilt." *Morris v. Ylst*, 447 F.3d 735, 746 (9th Cir. 2006); *see also Sivak v. Hardison*, 658 F.3d 898, 914 (9th Cir. 2011) (finding no *Napue* violation at the guilt phase as a result of

---

residence and did not find drugs or "any items of significance." (ECF No. 79-2 at 139, 225-26.)

1  false testimony because "[t]here was simply too much evidence placing [the defendant]
2  at the scene of the crime.").

3        The Ninth Circuit has also explained that *Napue* does not require relief when the
4  evidence at trial is "sufficiently powerful and abundant" such that false testimony "could
5  not have had any effect on the jury's determination." *Phillips v. Ornoski*, 673 F.3d 1168,
6  1191 (9th Cir. 2012). In *Phillips*, the Ninth Circuit reviewed whether the disclosure of
7  benefits provided to a witness in exchange for her testimony was material to the
8  petitioner's murder conviction. The prosecution withheld the fact that the witness had
9  been granted immunity. The Ninth Circuit held that the *Napue* violations were not material
10 to the jury's finding because it was "unimaginable" that the jury could have concluded that
11 the petitioner was not guilty with or without the false testimony. *Id.* at 1191.

12       **C.**    **Conclusions as to Impeachment Evidence and Kurash's Testimony**

13       Petitioner argues that the Court erred as a matter of law in finding against
14 materiality based on, in part, Kurash's impeachment because impeachment evidence is
15 not equal. (ECF No. 91 at 6.) Although the defense impeached Kurash on his past drug
16 use and the benefit he received on behalf of his wife, Petitioner argues that the
17 impeachment evidence presented at trial differs from the withheld evidence that would
18 have shown the jury that Kurash was "a felon, a liar, and out to help himself." (*Id*. at 11.)

19       In addition, Petitioner argues that the Court overlooked the critical fact that Kurash
20 was the only witness who testified that Petitioner "was the director of the store." (ECF No.
21 91 at 11.) He asserts that Kurash was the only witness to directly contradict Petitioner's
22 procuring agent defense and Kurash's "propensity to lie" would have impacted the jury's
23 assessment of his credibility when deciding whether Petitioner was, in fact, the director
24 of the store. (*Id*. at 12.)

25       As discussed above, the Court found that the Nevada Supreme Court's
26 determination that Petitioner failed to demonstrate materiality was not unreasonable and
27 noted that the defense impeached Kurash based on drug use and a benefit on behalf of
28 Kurash's wife. The Court did not find that the withheld evidence was cumulative to the

1  impeachment evidence evident in the record or elicited at trial. Because the withheld
2  evidence would not have been cumulative of the impeachment evidence introduced at
3  trial, the Court analyzes the significance of Kurash's testimony to the prosecution's case.
4  See Benn v. Lambert, 283 F.3d 1040, 1059 (9th Cir. 2002) (holding that undisclosed
5  evidence of a crucial government witness's drug use during the defendant's trial was
6  material because it would "reflect on [that witness's] competence and credibility as a
7  witness"). Petitioner asserts that Kurash was the only witness who testified that Petitioner
8  "was the director of the store." (ECF No. 91 at 11.)

Kurash testified as follows:

[State]: Okay. In the course of your responses to [defense counsel's] question, you said – you mentioned that you thought [Petitioner] was the director of the store. Could you explain what you meant by that.

[Kurash]: Yes, I will. Sometimes you would call a store directly. It would – he would call it a store. It was run by someone who answered the phone, you know, on a regular basis. You would say how much you need, and then would you [sic] go to a meeting spot, do your transaction with a runner.

In the beginning, [Petitioner] tried to shade himself from public view. Towards the end, I started getting a little bit more demanding only dealing with [Petitioner], and that seemed to come to fruition only dealing with [Petitioner].

[State]: So when you would call this number and a runner would show up, how did you know he was affiliated with [Petitioner].

[Kurash]: Because if it was short I would call [Petitioner] and tell him it's short.

(ECF No. 79-1 at 171.)

Although Kurash was the only witness to use the term "director of the store," his

testimony was not the only evidence to refute Petitioner's procuring agent theory of defense. Testimony from additional witnesses and other evidence presented at trial, such as the audio recordings of Petitioner and text messages, corroborated many of the key elements of Kurash's testimony. *See Hovey v. Ayers*, 458 F.3d 892, 920 (9th Cir. 2006) (corroborating testimony reduces prejudice of withheld impeachment evidence). In his testimony, Kurash explained that he thought Petitioner was the "director of the store," because Petitioner would answer the phone, Kurash would provide the amount he needed, then meet with a runner for the transaction. (ECF No. 79-1 at 171.) If the narcotics were short, Kurash would inform Petitioner. (*Id*.)

Detective Leyva testified that, as an undercover officer, he spoke to Petitioner over the phone to purchase methamphetamine and indicated he wanted to discuss additional purchases, quantities, and prices, and that Petitioner seemed "very willing" to discuss those subjects. (ECF No. 25-1 at 112-115.) After arranging the details of a purchase with Petitioner, Detective Leyva met with another individual for the drug transaction. (*Id*.) Detective Leyva contacted Petitioner again to discuss pricing for larger quantities. (*Id*. at 134.) He testified that he "asked [Petitioner] if I wanted to get something larger, is that something that would have to be prearranged, and [Petitioner] replied with, 'No, we have what you need. We have a lot." (*Id*.)

The State also presented text messages between the detective and Petitioner as well as between the detective and a number Petitioner provided to Detective Leyva leading up to the drug transaction. (*Id*. at 116.) Petitioner texted Detective Leyva asking him to "call the other number so they know, please. I already did, but I want my people to get to know you too, thanks." (ECF No. 26-1 at 98.)

Petitioner himself testified that he obtained methamphetamine for Kurash and Detective Leyva. (*Id*. at 93-94.) At trial, the State presented audio recording of Kurash's meeting with Petitioner. (ECF Nos. 24-1 at 131-32, 26-1 at 175.) During a controlled buy with Kurash, Kurash asked for an amount for his friend, "Pablo," who was Detective Leyva, and Petitioner told Kurash that he had to go get it and left in his vehicle, a white

1    Expedition. (ECF No. 24-1 at 154.) Detective Smith testified that he observed Petitioner
2    outside of his residence meeting with Kurash and observed Petitioner leave in his vehicle.
3    (ECF No. 25-1 at 226.) Detective Dondero testified that he observed a white Expedition
4    arrive at the trailer, an individual come out of the trailer who spoke to the driver of the
5    expedition, the individual handed an unknown object to the driver of the Expedition, and
6    the driver of the Expedition drove away from the trailer. (*Id*. at 214-15.) Detective Smith
7    testified that he observed Petitioner return to his residence and interact with Kurash upon
8    his return. (*Id*. at 228.) Detective Rasmussen testified that he followed the white
9    Expedition and observed the white Expedition drive to the trailer. (ECF No. 24-1 at 242.)

10        Detective Leyva's testimony demonstrates that he contacted Petitioner to arrange
11   drug transactions, including pricing, quantities, and meeting locations, and that Detective
12   Leyva purchased narcotics after making arrangements with Petitioner. Detectives
13   Rasmussen, Smith, and Dondero provided corroborating testimony regarding Petitioner
14   meeting with Kurash, then driving to the trailer to retrieve an object, and return to his
15   residence to provide it to Kurash. Detective Rasmussen testified that the trailer and
16   residence were associated with Petitioner. Detectives Marconato and Chalmers testified
17   that large quantities of methamphetamine were retrieved after executing a search warrant
18   for the trailer. The evidence the State presented was sufficiently powerful and abundant
19   that there is not a "reasonable likelihood" that the withheld evidence could have affected
20   the jury's judgment. *Phillips*, 673 F.3d at 1191.

21        The Court therefore did not err in concluding that the Nevada Supreme Court's
22   decision is neither contrary to nor an unreasonable application of federal law. Accordingly,
23   there is no showing by Petitioner that the Court's order and judgment as to Ground C
24   should be altered or amended because of clear error, mistake, or any other ground for
25   relief under Rule 59(e). The motion for reconsideration is denied.

26   **IV.   MOTION TO EXTEND**

27        Petitioner moved for an extension of time to file his reply in support of his motion
28   for reconsideration. (ECF No. 101.) The Court finds the request is made in good faith and

not solely for the purpose of delay, and therefore good cause exists to grant the motion.

## V. CONCLUSION

It is therefore ordered that Petitioner Tito Barron-Aguilar's Motion for Reconsideration (ECF No. 91) is denied.

It is further ordered that Petitioner's Motion to Extend (ECF No. 101) is granted *nunc pro tunc*.

It is further ordered that a certificate of appealability is denied.

DATED THIS 18th day of March 2024.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE